| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>EASTERN DISTRICT OF NEW YORK | Hearing Date: December 14, 2017<br>10:00 am |
| In re:<br><br>JAMES ANDREW FERNANDEZ,<br><br>                    Debtor. | Chapter 11<br><br>Case Nos. 17-12594 (SHL). |

OBJECTION TO THE MOTION TO VACATE THE
AUTOMATIC STAY OR TERMINATE EXCLUSIVITY

JAMES ANDREW FERNANDEZ, the debtor and debtor-in-possession herein (the "Debtor"), by and through his proposed undersigned counsel, objects to the motion (the "Motion") of CREIF Lender LLC. ("CREIF") for relief from the automatic stay [Docket No. 17] and respectfully states as follows:

1.      CREIF, by its Motion, seeks to vacate the automatic stay so it can conduct and immediate non-judicial sale of the Debtor's primary residence. However, grounds do not exist to vacate the automatic stay. As detailed below, the Debtor is attempting to sell his residence in a commercially reasonable manner to generate the funds for a plan of reorganization. And while the Debtor's valuation of the residence and CREIF's valuation of the residence differ, both show that CREIF has a sufficient equity cushion to protect it while this case proceeds.

JURISDICTION AND VENUE

2.      This Court has jurisdiction over the issues raised in the Motion pursuant to 28 U.S.C. §§157 and 1337 and venue is proper in this Court pursuant to 28 U.S.C. 1408 and 1409.

BACKGROUND

3.      The Debtor is an individual who is the managing member and president of Sperro Fabrication, Inc. ("Sperro Fabrication"), a company that fabricates architectural metal objects such as building awnings, archways, etc. Sperro Fabrication was formed in 2016. Previously, he operated a series of metal fabrication businesses. Beginning in 2011, Sperro Metal Products, LLC ("SMP"), a company owned by the Debtor, began to experience a business downturn. The Debtor and his wife obtained a home equity line of credit on their primary residence; a condominium apartment located at 114 Liberty Street, Apt. 8, New York, NY 10006 ("114 Liberty") to help support SMP. Despite the Debtor's best efforts, SMP was forced to cease operations in 2015.

4.      In or about 2014, the Debtor also fell into arrears on various loans, including 114 Liberty's mortgage and line of credit. In 2016, he was forced to utilized more of the equity from the 114 Liberty line of credit to finance the start of Sperro Fabrication; essentially purchasing some of SMP's assets from its secured creditors.

5.      To prevent a foreclosure on 114 Liberty's mortgage and line of credit, on February 17, 2016, the Debtor and his wife I entered into a "hard-money" loan with CREIF (the "CREIF Loan").

6.      The CREIF Loan contains the following terms:

    a.      The Debtor and his wife I were required to transfer 114 Liberty into a limited liability company, JLF Liberty, LLC. and pledge the LLC shares as collateral for the loan;

    b.      The loan matured on September 1, 2017;

    c.      The interest rate was 11% per annum;

        d.        The principal amount of the loan was $5,250,000, which included prepaid interest of $48,793.40 per month through September 1, 2017;

        e.        If the loan was not repaid refinanced or extended by September 1, 2017, it was in default, entitling the lender to an interest rate of 24% per annum.

7.        Because of the structure of the CREIF Loan, if it was not repaid or refinanced by September 1, 2017, CREIF had the ability to conduct a non-judicial UCC Article 9 sale of the Debtor and his wife's interests in JLF Liberty, LLC.

8.        Immediately after entering into the CREIF Loan, the Debtor began efforts to sell 114 Liberty.  When the Debtor was unable to sell 114 Liberty or refinance the loan by September 1, 2017, CREIF scheduled a UCC Article 9 sale of the LLC interests (the "UCC Sale") for September 18, 2017.

9.        The instant bankruptcy was filed on September 17, 2017 to prevent the UCC Sale.

10.        After the bankruptcy was filed, the Debtor has continued his attempts to sell 114 Liberty.  He has also sought to refinance his debt to CREIF.  To aid in these tasks, on October 17, 2017, the Debtor had an appraisal of 114 Liberty (the "Debtor's Appraisal") performed, which valued the property at $7,850,000.  See Debtor's Appraisal, Page 8.  A copy of the Debtor's Appraisal is attached hereto as Exhibit "A".

## ARGUMENT

### A.    CAUSE DOES NOT EXIST UNDER SECTION 362(d)(1)

11.        CREIF incorrectly argues that cause exists to vacate the automatic stay pursuant to Section 362(d)(1) of 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code").  In its brief analysis on this point argues that it does not have an equity cushion (Motion p. 8).  This argument is simply

3

incorrect. In the Motion, CREIF includes a claim amount of $6,814,945.46. (See Motion, Exhibit L).

12.  CREIF's purported claim amount is overstated and improper on its face. For instance, though the Motion claims default interest began to run when the Debtor made a technical default (failing to pay property taxes) on July 14, 2017. (See. Motion p. 3). However, the claim seeks "Retroactive Default Interest" at 24% from the beginning of the loan, in the amount of $805,729.17. Further, the claim not only seeks prospective default interest through February 2018, it seeks $24,354.00 in publication fees and $53,000 in legal and administrative fees.

13.  Even if CREIF's claim amount was true and correct (which the Debtor contests), CREIF's own appraisal shows that it has a large equity cushion. CREIF includes an appraisal of 114 Liberty as part of the Motion, which values the apartment at $7,100,000. (See Motion, Exhibit K, "CREIF's Appraisal"). The Debtor does not believe that CREIF's Appraisal accurately reflects the value of the premises, for reasons including it did not take into consideration the condition of the interior. (See CREIF's Appraisal, p. 2). However, even using the value of the premises in CREIF's Appraisal and using CREIF's overstated claim, CREIF has an equity cushion of approximately $300,000 through February 2018. Of course, CREIF's equity cushion would be over $1 million if CREIF's "Retroactive Default Interest" was removed from its claim amount, and close to $2 million if the Debtor's Appraisal value of the premises was used.

14.  Thus, given that even using CREIF's own numbers it has a substantial equity cushion, it has not shown that cause exists to terminate the automatic stay under Bankruptcy Code Section 362(d)(1). See *In re Elmira Litho, Inc.*, 174 B.R. 892, 904 (Bankr. S.D.N.Y.1994) ("An equity cushion, therefore, provides adequate protection if it is sufficiently large to ensure that the

4

secured creditor will be able to recover its entire debt from the security at the completion of the case.")

### B.    CAUSE DOES NOT EXIST UNDER SECTION 362(d)(2)

15.    The Motion, also incorrectly argues that cause exists to vacate the automatic stay on the grounds the Debtor cannot confirm a plan of reorganization. CREIF errs in three manners; first, it undervalues 114 Liberty; second it incorrectly presumes that all of the debts on the property are solely owed by the Debtor and can, therefore, only be paid by the Debtor; and third, it does not take into consideration payments from the Debtor's businesses to help fund a plan of reorganization.

16.    As stated above, CREIF bases its determination of whether the Debtor has equity in 114 Liberty on its overstated claim and undervalued appraisal.  If the Debtor is successful in challenging CREIF's claim (which it will seek to do in a separate motion), CREIF's argument fails.

17.    Further, added to CREIF's analysis of the Debtor's equity in the property are certain debts owed by the Debtor's businesses – the debt owed to the IRS and Capflow Mortgage.  These obligations are being paid by the businesses.  Accordingly, they should not be considered in the context of a lift stay motion.

18.    Similarly, the debtor is in the process of formulating a plan of reorganization that will sell the property and pay his debts through a combination of the sale proceeds and income from his businesses.  Thus, while the property is necessary for the reorganization, it is not its only funding source.

C. **THE MOTION FAILS THE SONNAX TEST**

19. The Second Circuit, in the case *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)* 907 F2d 1280, 1285-86 (2d Cir. 1990) ("Sonnax") set forth twelve factors that courts should consider when determining whether to vacating the automatic stay in order to let a party pursue a non-bankruptcy action against the debtor.

20. The twelve *Sonnax* factors are:

(1) whether relief would result in a partial or complete resolution of the issues;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of harms.

*Id. Sonnax* also notes that not all factors will be relevant in all cases.

21.     Here, those factors that are relevant, weigh in favor of the Debtor, as follows:

(1) Would relief give a partial or full resolution of the issues?

22.     Only partial relief could be given by lifting the automatic stay because the Debtor would need to then immediately move in New York Supreme Court by order to show cause for a temporary restraining order staying the intended UCC sale on grounds including CREIF violated New York's Home Equity Theft Prevention Act ("HETPA", NY RPL §265-a) and would challenge the interest and, possibly, principal amount of CREIF's claim.

(2) Is there a connection with or interference with the bankruptcy case?

23.     There is a direct connection between CREIF's attempt to foreclose on the Debtor's residence and this case, as the proceeds of the sale will help fund the Debtor's plan of reorganization.

(3) Does the other proceeding involve the debtor as a fiduciary?

24.     The other proceeding does not involve the Debtor as a fiduciary.

(4) Has a specialized tribunal been established to hear the suit?

25.     If the automatic stay is lifted, the matter will end up in New York State Supreme Court, not a specialized tribunal.

(5) Has the debtor's insurer assumed full responsibility for defending the suit?

26.     This factor is inapplicable in this case.

(6) Does the suit primarily involve third parties?

7

27. Any action in New York State Supreme Court would involve the Debtor, his wife (as 50% owner of 114 Liberty) and JLF Liberty, LLC, the entity created for the loan transaction.

(7) Would litigation in another forum prejudice the interests of other creditors?

28. A UCC Sale will directly and negatively affect the Debtor's other creditors, as it would take a valuable asset away from the Debtor's estate.

(8) Would a judgment claim arising from the other action be subject to equitable subordination?

29. This factor is inapplicable in this case.

(9) Would movant's success in the other proceeding result in a judicial lien avoidable by the debtor?

30. This factor is inapplicable in this case.

(10) Are the interests of judicial economy and the expeditious and economical resolution of litigation served?

31. As the Debtor would be forced to immediately move in New York Supreme Court by order to show cause for a temporary restraining order, the interests of judicial economy would not be served.

(11) Are the parties ready for trial in the other proceeding? and

32. While CREIF is ready to move forward with its UCC Sale, once the debtor moves in New York Supreme Court, litigation would begin. Thus, the parties are not ready for trial.

(12) What is the impact of the stay on the parties and the balance of harms?

33. As shown above, CREIF has a substantial equity cushion in the property. Accordingly, they will not be harmed if the stay is not vacated. Conversely, if the stay is vacated,

the Debtor and the rest of the creditors will be greatly harmed, as the estate will lose a significant asset.

34. Given that CREIF has not and cannot show prejudice (other than losing the ability to take the Debtor's residence without even going through the real estate foreclosure process), CREF has a substantial equity cushion, and the property is necessary for a successful reorganization, CREIF should not be permitted to vacate the automatic stay and proceed with an Article 9 sale of the Debtor's residence.

### D. THE DEBTOR'S EXCLUSIVITY PERIOD SHOULD NOT BE REDUCED

35. The Debtor has been actively marketing the sale of 114 Liberty and seeking a refinance of the CREIF Loan. As the property is very expensive, even by New York City standards, it is a lengthy process. Accordingly, it is not reasonable to expect it to be completed in time since the case was filed.

36. Further, it is in the Debtor's best interest to sell 114 Liberty for the highest price. This will allow him to propose a plan of reorganization that satisfy his creditors. Conversely, it is in CREIF's interest to allow it to take the property outside an orderly sale process, which would allow foreclose on a property that is worth more than it claim – even with its "Retroactive Default Interest" at 24% from the initial date of the loan.

37. Accordingly, the Debtor should be allowed the opportunity to propose a plan of reorganization that will benefit more than just CREIF.

## **CONCLUSION**

38. The terms of the CREIF Loan shows that CREIF is a very sophisticated lender that has taken advantage of the Debtor and his wife. Its claim, which includes "Retroactive Default Interest" at 24% from the initial date of the loan, shows it intends to continue to take advantage of the Debtor postpetition.

39. What CREIF has not been able to show, however, is that it is entitled to vacate the automatic stay so it can continue with its UCC Sale of the Debtor and his wife's residence.

WHEREFORE, the Debtor respectfully requests this Court deny the Motion and grant such other and further relief as just and appropriate.


Dated: December 6, 2017
      Rockville Centre, New York

/s/
Paul A. Rachmuth (PR1566)
Attorney at Law
265 Sunrise Highway, Ste. 62
Rockville Centre, NY  11570
Telephone:   (516) 330-0170
Facsimile:   (516) 543-0516

Proposed Counsel to James Andrew Fernandez
    debtor and debtor-in-possession